IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:22-CV-171-FL

| | |
|---|---|
| JOSEPH ROBERT MCLAUGHLIN, LORI READY-DIGIOVANNI, and JUAN CARLOS BELTRAN, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ONSLOW COUNTY BOARD OF ELECTIONS; Jason Dedmond in his official capacity as director of the Onslow County Board Of Elections; MICHAEL A. MORGAN in official capacity as chairman of the Onslow County Board Of Elections; LAURA DEPTOLA in her official capacity as Secretary of Onslow County Board of Elections; JOHN MOORE in his official capacity as a board member of the Onslow County Board of Elections; STEPHANIE MOSER in her official capacity as a Board Member of The Onslow County Board of Elections; MARCIA WRIGHT in her official capacity as a board member of the Onslow County Board of Elections; CITY OF JACKSONVILLE, NORTH CAROLINA; MAYOR SAMMY PHILLIPS; BRIAN H. JACKSON in his official capacity as City of Jacksonville Council Member; LOGAN SOSA IN HIS OFFICIAL CAPACITY AS CITY OF JACKSONVILLE COUNCIL; CINDY EDWARDS IN HER OFFICIAL CAPACITY AS CITY OF JACKSONVILLE COUNCIL MEMBER; JERRY BITNER IN HIS OFFICIAL CAPACITY AS CITY OF JACKSONVILLE COUNCIL MEMBER; ROBERT WARDEN IN HIS OFFICIAL CAPACITY AS CITY OF JACKSONVILLE COUNCIL MEMBER; and ANGELIA WASHINGTON IN HER OFFICIAL CAPACITY AS CITY OF JACKSONVILLE COUNCIL MEMBER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ORDER |
| Defendants. | ) ) |

This matter is before the court on motions to dismiss by defendants Jason Desmond, Laura Deptola, John Moore, Michael A. Morgan, Stephanie Moser, Marcia Wright, and Onslow County Board of Elections ("Board of Elections defendants"), (DE 46), and defendants Jerry Bitner; City of Jacksonville, North Carolina; Cindy Edwards; Brian H. Jackson; Sammy Phillips; Logan Sosa; Robert Warden; and Angelia Washington ("city defendants"). (DE 48). The issues raised are ripe for ruling. For the following reasons, the motions are granted.

## STATEMENT OF THE CASE

Plaintiffs, registered voters in Jacksonville, North Carolina, commenced this action challenging the districting scheme used to elect Jacksonville city council members by complaint filed September 28, 2022. Plaintiffs bring claims under the Fourteenth Amendment to the United States Constitution and under the North Carolina State Constitution, seeking declaratory judgment, nominal damages, attorneys' fees, and costs. Board of Elections defendants filed their instant motion December 5, 2022, under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the complaint fails to allege any acts committed by them. City defendants filed their instant motion under Rules 12(b)(1) and 12(b)(6) the same day, asserting that plaintiffs lacked standing to assert two of their three Fourteenth Amendment claims and had failed to state facts giving rise to a plausible inference of liability on all claims. Plaintiffs responded in opposition to both motions by separate filings January 10, 2023, and all defendants replied January 17, 2023.

## STATEMENT OF FACTS

The relevant facts alleged in the complaint may be summarized as follows. Plaintiffs are registered voters residing in Wards 1, 2, and 4 of Jacksonville, North Carolina. (Compl. ¶¶ 1-3). Defendant Onslow County Board of Elections "is the governmental agency charged with conducting [Jacksonville] municipal elections," (id. ¶ 4), and defendant City of Jacksonville

2

("Jacksonville") "is a municipal corporation . . . charged with the task of creating city council districts." (Id. ¶ 5).

Prior to 1989, all Jacksonville city councilors were elected at large. (Id. ¶ 24). Following a legal challenge to that scheme under the Voting Rights Act, defendant Jacksonville adopted a hybrid system in which one city councilor is elected in each of four wards and the mayor and two city councilors are elected at large. (Id. ¶ 26). At that time, Jacksonville allegedly drew the wards such that the Black community could elect two city council members, and the suit was resolved out of court. (Id. ¶ 27). The following year, the city annexed "portions of Camp Lejeune," a military installation. (Id. ¶ 30).

In 2006, Jacksonville revised its city charter such that "following pre-clearance[1] . . . by the Department of Justice," the mayor and city councilors would be elected at staggered intervals. (Id. ¶ 33). That amendment referred to Wards 1 and 4 as "minority ward[s]." (Id.). The city also allegedly "continued to create two 'minority' or African-American districts [in] the redistricting plan for the 2010 elections." (Id. ¶ 35). Following the disposition of Shelby County v. Holder in 2015, Jacksonville ceased to be subject to the preclearance regime. 570 U.S. 520.

Following the 2020 census, defendant Jacksonville "adopted a plan for elections to be conducted for the four wards of" the city. (Id. ¶ 43). During "the hearing process" for this plan, defendant Jacksonville allegedly posted the following statement on its website.

> Special Wards: Jacksonville has benefited from having two special minority-majority wards, which help leverage minority votes to help provide representation on the City Council. A federally held standard called retrogression holds that changes made to the wards cannot diminish the ability of minorities to be elected.

---

[1] Under the preclearance regime, certain jurisdictions could not change their voting practices without obtaining first approval from the United States Attorney General or a declaratory judgment that the proposed practice "would not have the purpose or effect of denying or abridging the right to vote on account of race or color" from the United States District Court for the District of Columbia. 52 U.S.C. § 10304 (formerly codified as 42 U.S.C. § 1973(c)).

(Id. ¶ 46). During the same hearing process, plaintiff Joseph Robert McLaughlin ("McLaughlin") "appeared at public hearings," (id. ¶ 47) stated his opinion that the maps "were drawn . . . by partisan Democrats" who assumed that "the people of Jacksonville are simply too racist to elect a non-white councilmember," (DE 3-9 at 2),[2] and proposed an alternative election map. (See id. at 3). "The City and the Commission rejected this proposal." (Compl. ¶ 47).

According to the complaint, the enacted map placed "substantially of the population of the military bases" of Jacksonville in Wards 1 and 4, (id. ¶ 44), the wards referred to as "minority wards" in the city charter, (See id. ¶ 33), with the result that there are 3,279 registered voters residing in Ward 1, 11,944 in Ward 2, 10,471 in Ward 3, and 4,223 in Ward 4 despite roughly equal total populations in each ward. (See id. ¶ 42).

## COURT'S DISCUSSION

A.   Standard of Review

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction, and the plaintiff bears the burden of showing that federal jurisdiction is appropriate when challenged by the defendant. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).[3] Such a motion may either 1) assert the complaint fails to state facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject matter jurisdiction in fact, apart from the complaint. Bain, 697 F.2d at 1219. Where a defendant raises a "facial challenge[] to standing that do[es] not dispute the jurisdictional facts

---

[2]   The court "may consider documents attached to the complaint . . . so long as they are integral to the complaint and authentic." Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

[3]   Internal citations and quotation marks are omitted from all citations unless otherwise specified.

4

alleged in the complaint," the court accepts " the facts of the complaint as true as [the court] would in context of a Rule 12(b)(6) challenge." Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018).

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.   Analysis

   1.   Standing

City defendants argue that plaintiffs lack standing to pursue their racial gerrymandering claim on the grounds that the only plaintiffs asserting it reside outside the challenged districts, and plaintiffs lack standing to pursue their vote dilution claim where no concrete and particularized harm is alleged.[4] "Article III of the Constitution confines the federal courts to adjudicating actual cases and controversies." Allen v. Wright, 468 U.S. 737, 751 (1984). Courts "enforce that requirement by insisting that a plaintiff satisfy the familiar three-part test for Article III standing: that he 1) suffered an injury in fact, 2) that is fairly traceable to the challenged conduct of the defendant, and 3) that is likely to be redressed by a favorable judicial decision." Gill v. Whitford,

---

[4] Defendants do not dispute plaintiffs' standing to pursue their "one person, one vote" claim. (Compl. ¶¶ 58-64).

5

138 S.Ct. 1916, 1929 (2018). Plaintiffs seeking declaratory and injunctive relief must also "establish an ongoing or future injury in fact." Kenny, 885 F.3d at 287 (4th Cir. 2018).

Considering these standards, for the following reasons, plaintiffs have not alleged a concrete and particularized harm sufficient to pursue a vote dilution claim. By contrast, plaintiff Beltran has standing to challenge whether Ward 4, the district in which he resides, was racially gerrymandered, but he has not stated a claim upon which relief can be granted.

      a.      Vote Dilution

"[A] party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury," that is, the party must have individual standing to bring a suit before the court. See Hollingsworth v. Perry, 570 U.S. 693, 715 (2013). The injury must be personal, meaning that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975); see also Kenny, 885 F.3d at 287 ("At least one plaintiff must demonstrate standing for each claim and form of requested relief."). "The party invoking federal jurisdiction bears the burden of establishing standing." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014).

Plaintiffs assert that "[a]ll non-African-American voters within the City of Jacksonville" have had the strength of their votes diluted, (compl. ¶ 18), asserting that "two districts elect candidates of the African-American community's choice," (compl. ¶ 17) whereas Jacksonville demographics suggest that only "[o]ne candidate of the African-American community's choice would constitute proportional representation." (Id. ¶ 70). This is precisely the kind of "generalized grievance" that is "insufficient to confer standing." Hollingsworth v. Perry, 570 U.S. 693, 706 (2013). This court lacks the power to adjudicate plaintiffs' claim that Black citizens have too much voting power where plaintiffs have failed to allege that such power "affect[s them] in a personal

6

and individual way." Spokeo v. Robins, 578 U.S. 330, 339 (2016).  Where plaintiffs have not made allegations "that would tend to demonstrate a burden on their individual votes," their vote dilution claim must be dismissed.  Gill, 138 S. Ct. at 1934.

Plaintiffs rely on Wright v. North Carolina, in support of their argument that they "have suffered an individual harm to their right to an undiluted vote," (DE 51 at 9), however, that case did not address standing.  787 F.3d 256 (4th Cir. 2015).  Instead, it concerned the "one person one vote" principle, addressed in section b. below.  Accordingly, plaintiffs' vote dilution claim is dismissed for lack of standing.

    b.  Racial Gerrymandering

Plaintiff Beltran has standing to challenge Ward 4, in which he resides, however, the complaint does not allege facts supporting an inference that Ward 4 has been racially gerrymandered.

      i.  Standing of Plaintiff Beltran

"A plaintiff who alleges he is the object of a racial gerrymander – a drawing of district lines on the basis of race – has standing to assert only that his own district has been so gerrymandered." Gill, 138 at 1930.  The complaint alleges that plaintiff McLaughlin "is a Ward 2 registered voter," (compl. ¶ 1), plaintiff Ready-DiGiovanni is a Ward 3 registered voter," (id. ¶ 2), and plaintiff Beltran "is a Ward 4 registered voter."  (Id. at 3).  Plaintiffs challenge Wards 1 and 4, asserting that defendant Jacksonville "intentionally . . . [and] artificially creat[ed] two districts . . . which have a substantial majority of African-American voters."  (Id. ¶ 52).  Thus, Beltran has standing to challenge Ward 4, the allegedly gerrymandered district in which he lives.

The complaint's assertion that "[t]he new redistricting map . . . dilutes and burdens the rights [sic] to vote of those voters, like the plaintiffs, who do not live in wards 1 and 4," (compl. ¶

7

57), does not, as defendants suggest, mean that plaintiffs "limited the scope of their gerrymandering claim" so as to exclude Beltran's claim. (DE 54). The court declines to adopt this limited reading of the complaint where plaintiffs also assert that "use of race creates a harm to any voter within [a gerrymandered] district." (Compl. ¶ 15). Though the complaint is not a model of clarity, the court interprets this statement to allege harm to Beltran based upon the assertion that he lives in a gerrymandered district.[5]

        ii.        Merits

Although plaintiff Beltran has standing to pursue a racial gerrymandering claim, he has not alleged facts permitting an inference that Ward 4 was so gerrymandered. "The Equal Protection Clause of the Fourteenth Amendment . . . prevents a state, in the absence of sufficient justification, from separating its citizens into different voting districts on the basis of race." Cooper v. Harris, 581 U.S. 285, 291 (2017). A plaintiff alleging racial gerrymandering must allege facts that, if true, would support an inference that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district [by alleging that] the legislature subordinated other factors [such as] compactness, respect for political subdivisions, [or] partisan advantage . . . to racial considerations." Id. The allegations may [involve] "direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." Id. Only if the plaintiff makes the required showing will the design of the district be subject to strict scrutiny. See id. "The good faith of the state legislature must be presumed, [and is] not changed by a finding of past discrimination." Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018).

---

[5]     Where plaintiffs McLaughlin and DiGiovanni live in Wards 2 and 3, respectively, (see compl. ¶¶ 1-2), which are not asserted to be products of racial gerrymandering, those parts of this claim asserted by plaintiffs other than Beltran is dismissed without prejudice for lack of subject matter jurisdiction.

8

The court is unable to assess the intent of a redistricting authority where that authority is not identified in the complaint. See, e.g., Cooper, 581 U.S. at 299 (noting that state senator Robert Rucho and state representative David Lewis "repeatedly told their colleagues that District 1 had to be majority-minority"); Abbott, 138 S. Ct. at 2327 (assessing the intent of "the 2013 [State] Legislature," which implemented the challenged electoral maps). The complaint alleges both that "the City Council during the redistricting process knew . . . the historic election returns and the political demography of Jacksonville," (compl. ¶ 45), and that "the City and the Commission rejected" plaintiff McLaughlin's proposed redistricting plan, (compl. ¶ 47), however, it does not specify whether the "Commission" or the "City Council" had authority to redistrict. While the complaint does specify that defendant "City of Jacksonville is a municipal corporation . . . charged with the task of creating city council districts," mechanisms for drawing and voting on these districts are never identified. The court is unable to draw an inference that "race was the predominant factor" motivating the decision to redistrict in a particular way when the relevant decisionmaker is not named.

In addition, none of the allegations in the complaint address properly the challenged 2022 map at issue. According to the complaint, the Jacksonville City Charter, last amended in 2006, references "minority wards" in the following context:

> Effective December 27, 2006, at the next regular municipal election following pre-clearance of this Charter Amendment by the Department of Justice, if said pre-clearance occurs on or before the last day of the filing period for said election, the candidates receiving the highest number of votes for the Office of Mayor and the candidates receiving the highest number of votes for Ward 3 and Ward 4 (minority ward) Council Members shall be elected for an initial four (4) year term; and the two candidates receiving the highest number of votes for At-Large Council Members and the candidates receiving the highest number of votes for Ward 1 (minority ward) and Ward 2 Council Members shall be elected for an initial two (2) year term. Subsequent elections for the Mayor and all City Council Members shall be for four-year terms and until their successors are elected and qualified.

9

(Compl. ¶ 33).  The city charter does not shed light on the unspecified redistricting authority's motivations for adopting the challenged 2022 map, addressing as it does a city council election plan developed under a different legal regime and implemented more than fifteen years prior to the institution of the challenged 2022.  For the same reasons, the City's statement on its website that it "has benefited from having two special minority-majority wards, which help leverage minority votes to help provide representation on the City Council," referencing as it does the asserted benefits of past districting schemes, fails to provide any insight into the motivations of the authority that enacted the challenged 2022 map.  (Compl. ¶ 46).  In the absence of allegations directed towards the challenged 2022 map, the court cannot draw an inference that such plan violates the Constitution.

Plaintiffs argue that Jacksonville "created a racial quota for redistricting," comparing this case to Bethune-Hill, in which "the Virginia House of Delegates was [allegedly] attempting to draw 12 minority opportunity districts that would routinely return African-American representatives to the House of Delegates."  (DE 51 at 11) (citing Bethune-Hill, 580 U.S. at 191-192).  In Bethune-Hill, however, the plaintiffs specified the body responsible for redistricting, the Virginia House of Delegates, and alleged that "the boundary lines for the . . . districts at issue were drawn with the goal of ensuring that each district would have a black voting-age population . . . of at least 55%."  Bethune-Hill, 580 U.S. at 181.  In the instant case, however, the complaint identifies neither the body responsible for redistricting nor any facts illuminating its motivations.  Therefore, Bethune-Hill is instructively distinguishable.

Plaintiff's suggestion that "invocation of strict scrutiny any time race [is] a criterion in redistricting . . . is now the applicable law" likewise is unsupported by case law.  (DE 51 at 13).  The "legislature is always aware of race when it draws district lines, just as it is aware of a variety

10

Case 7:22-cv-00171-FL   Document 56   Filed 08/22/23   Page 10 of 12

of other demographic factors," Bethune-Hill, 580 U.S. at 187, and strict scrutiny applies only if race is "the legislature's predominant motive for the design of the district as a whole. Id. at 192 (emphasis added); accord Abbott, 138 S. Ct. at 2334-35 (applying strict scrutiny where "race was the predominant factor in the design of" the challenged district). Accordingly, plaintiffs' racial gerrymandering claim fails as a matter of law.

2. One Person One Vote Claim

Plaintiffs' claim that the "one person, one vote" principle demands apportionment based on registered voters is foreclosed by Supreme Court precedent.

"It is plainly permissible for jurisdictions to measure equalization by the total population of state and local legislative districts." Evenwel v. Abbott, 578 U.S. 54, 64 (2016); see also Daly v. Hunt, 93 F.3d 1212, 1225 (4th Cir. 1996) (recognizing that in 1965 apportionment based on total population was stated to be "constitutionally unassailable beyond question."). The Supreme Court "has always assumed the permissibility of drawing districts to equalize total voter population." Evenwel, 578 U.S. at 72. Accordingly, the court declines to enjoin Jacksonville's apportionment scheme on these grounds.

Plaintiffs argue that "jurisdictions are allowed to equalize voters," (DE 51 at 23), relying on Burns v. Richardson. See 384 U.S. 73 (1966). Plaintiffs, however, ignore the difference between allowing a practice and requiring it. Plaintiffs have not submitted, and the court has not found, any case in which a locality was required to apportion based on registered voters. Accordingly, this claim fails.

3. North Carolina State Constitutional Claim

The court addresses finally plaintiffs' claim under the North Carolina State Constitution. If a remedy exists in this case, it exists under state law. See, e.g., Bolkhir v. North Carolina State

11

University, 321 N.C. 706, 709 (1988). "A district court may decline to exercise supplemental jurisdiction over a pendent state law claim if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "If the federal claims are dismissed before trial. . . the state claims should be dismissed as well." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966). See also Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary"). Accordingly, where all federal claims are dismissed, the court declines to exercise supplemental jurisdiction over plaintiff's state constitutional claim.

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss for lack of subject matter jurisdiction and failure to state a claim, (DE 46, 48), are GRANTED. Racial gerrymandering claims (count one) asserted by plaintiffs McLaughlin and DiGiovanni are dismissed without prejudice for lack of subject matter jurisdiction and the same claim by plaintiff Beltran is dismissed for failure to state a claim. Plaintiffs' "one person one vote" claims (count two) are dismissed for failure to state a claim. Plaintiffs' vote dilution claims (count three) are dismissed without prejudice for lack of subject matter jurisdiction. Plaintiffs' state constitutional claims are dismissed where the court declines to exercise jurisdiction. The clerk is DIRECTED to close this case.

SO ORDERED, this the 22nd day of August, 2023.

_/s/ Louise W. Flanagan_
LOUISE W. FLANAGAN
United States District Judge